IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| United States of America, | : | Case No. 3:19-CR-4-2 |
| Plaintiff, | : | HON. JAMES G. CARR |
| vs. | : | **DEFENDANT ARMSTRONG'S CORRECTED MOTION TO SUPPRESS** |
| Vincent Armstrong, | : | |
| | | (Evidentiary Hearing Requested) |
| Defendant. | : | |

Defendant Vincent Armstrong respectfully moves the Court for an order suppressing from use at trial any oral or written statements procured in violation of the Fifth Amendment and *Miranda v. Arizona*, 384 US 436, 467 (1966).  An evidentiary hearing is requested, as the arguments supporting this Motion require close examination of the facts and circumstances surrounding the December 10, 2018 interrogation of Mr. Armstrong.

A memorandum in support of this motion follows.

EASTMAN & SMITH LTD.

/s/ Adam S. Nightingale
Adam S. Nightingale (0079095)
One SeaGate, 24th Floor
P.O. Box 10032
Toledo, Ohio  43699-0032
Telephone:   (419) 241-6000
Fax:         (419) 247-1777
E-Mail:      asnightingale@eastmansmith.com

Attorney for Defendant Vincent Armstrong

4825541.1

**MEMORANDUM IN SUPPORT**

> If a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home.[1]

### BACKGROUND[2]

On the morning of December 10, 2018, Vincent Armstrong awoke in his second-floor bedroom to the sound of breaking glass. At first, he thought his cat knocked over a glass in the kitchen, but soon he heard more crashing and the house began to shake. He heard multiple voices begin to yell: "Come out with your hands up!" "Don't make us come up there, or it'll get ugly!" Vince promptly complied with the commands, opened his bedroom door, and walked to the top of the stairs. When he looked down, he saw a riot shield and several assault rifles pointed directly at him. He was ordered to place his hands behind his head and walk down the steep set of stairs, backwards. Again, he promptly complied. When he reached the bottom of the stairs, Vince was handcuffed and led to the couch. After sitting down, he watched as his girlfriend and roommate, Elizabeth Lecron, was similarly ordered to come downstairs, backwards, with her hands up, after which she was handcuffed as well.

At this point, Vince was in shock, as one might expect of a 22-year-old young man in this situation with no meaningful prior experience with law enforcement. As he surveyed his surroundings from the couch, he noticed that each of the first-floor windows had been broken by the agents on scene, and broken glass was strewn about the floor (indeed, he had to dodge shards of glass when walking to the couch). A swarm of agents and officers were in and around the house; Vince estimates

---

[1] *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008).

[2] Mr. Armstrong respectfully requests an evidentiary hearing to more fully develop the facts at issue in this motion.

approximately twenty agents were present, and that estimation was confirmed by an unidentified agent. (Interview Recording, 11:23:40).

At 10:21 a.m., FBI Special Agent Shannon Coates activated a recording device and approached the home (located at 3608 Willow Run Drive in Toledo, Ohio). After being told to "work his magic," Agent Coates entered the home, along with FBI Special Agent Sara Pederson, and initiated contact with Vince. This was the start of an interrogation which would last upwards of five hours.

Vince lived in a three-bedroom house with an attached, insulated garage, with a number of rooms appropriate for an interrogation. Rather than select one of the three bedrooms, the garage, or another room, Agents Coates chose to interrogate Vince in the upstairs bathroom. (Interview Recording, 10:27:50). The bathroom was 5 feet by 9 feet (45 sq. ft.), but even those meager dimensions are deceiving, because the room contains a large bathtub, a sink and vanity, and a toilet. A sketch of the room (to scale) is below:



4825541.1

When Agent Coates entered the bathroom, he closed the toilet lid, and instructed Vince to sit on the toilet. (Interview Recording, 10:28:05). He also instructed Agent Pederson to find a chair to bring into the bathroom.

The improvised interrogation room was a tight fit. We know that because when Agent Pederson returned with a chair, she audibly struggled to get the chair into the bathroom, and exclaimed "It's a tight fit!" *Id.* at 10:29:00. Ultimately, Vince was seated on the toilet, Agent Coates was sitting on the edge of the bathtub (*i.e.*, mere inches from Vince), and Agent Pederson sat on a chair or stool located directly between Vince and the door, blocking his ability to leave:



The door was initially closed, but was eventually cracked slightly open when the room became hot (which is not reflected in the picture above). This setup was designed to box Vince in and overbear his will. After everyone was settled, Agent Coates asked for Vince's assurances that he would "be a

4825541.1

gentleman," as a necessary prerequisite to removing his handcuffs. *Id.* at 10:30:05. After receiving that assurance, Agent Coates removed Vince's cuffs. *Id.*

At this point, the questioning began. At the very beginning of the interrogation, Agent Coates told Vince he was not under arrest and that he was free to leave, before quickly changing the subject. Vince was not advised that he had the right to remain silent, that he had a right to an attorney, or that he was free to not answer the agents' questions. Rather, the encounter was initially framed as an opportunity for Vince to ask questions about what was going on.

After the initial colloquy, Agent Pederson began asking questions, mostly relating to Ms. Lecron. After approximately 45 minutes of questioning, Agents Coates and Pederson took a break and left the room. Agent Coates advised Vince that he could not leave Vince alone, and so a third agent was called in to guard Vince. *Id.* at 11:18:35. As the new agent entered the room for guard duty, Agent Coates cleverly asked the agent to "hold his phone for him" so they could continue to record Vince (without his knowledge) while Agents Coates and Pederson left the room. *Id.* at 11:20:18. The third agent engaged Vince in conversation and, importantly, sat between Vince and the door with his arms crossed, blocking the exit. The message was clear: Vince was not free to leave.

After about 20-25 minutes, Agents Coates and Pederson returned to the makeshift interrogation room. At this point, the tone of the interview changed significantly, and the questions became confrontational. For the next few *hours*, Agent Coates repeatedly confronted Vince and accused him of lying. Agent Coates alluded to Vince's future prosecution. *Id.* at 13:51:35 ("As it stands now, there will be a couple of people potentially at the defendants' table, and one of them will look completely and totally honest,[3] and one of them will not. And right now it's you"). He indicated that those in the court system would look more favorably upon Vince if he confessed. *See, e.g., id.* at

---

[3] During the interrogation, Agent Coates repeatedly told Vince that Ms. Lecron was in the garage admitting to everything in the "giant pile of evidence" against the two of them.

5

4825541.1

13:54:35 ("Judges, juries, prosecutors all like" people who come clean and admit their mistakes).  And he confronted Vince with incriminating evidence found both earlier in the investigation and that day during the December 10, 2018 search.

This questioning went on for hours.  Just how long is unclear, though the interview recording stops at 3:06 p.m., more than *four and a half hours* after the interrogation began.  After the audio recording was stopped, Vince was led downstairs.  Agents Coates and Pederson went outside for an extended period of time, during which they asked the same agent as before to stand guard over Vince.  Vince was eventually permitted to eat, but was not permitted to make his own food.  Finally, nearly six hours after arrival, Vince was arrested.

## LAW AND ARGUMENT

### 1. The Fifth Amendment and *Miranda*

The Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  Inherent in this right against self-incrimination is the "right 'to remain silent unless [the accused] chooses to speak in the unfettered exercise of his own will.'"  *Miranda v Arizona*, 384 US 436, 460 (1966) (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)).

"In *Miranda*[,] the Supreme Court recognized that custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 467). To counterbalance the inherent pressures of custodial interrogation, "*Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused," such as advising the suspect of his right to remain silent and his right to counsel.  *Id.*  Law enforcement officers are free to question witnesses, suspects, or anyone else without giving a *Miranda* warning, but only when the questioning occurs in a non-custodial environment.

6

4825541.1

*Stansbury v. California*, 511 U.S. 318, 322 (1994) ("An officer's obligation to administer *Miranda* warnings attaches . . . only when there has been such a restriction on a person's freedom as to render him in custody." (quotation marks omitted)).

### 2. Mr. Armstrong was in custody.

A suspect does not have to be under "formal" arrest in order to trigger the *Miranda* warnings. *Michigan v Summers*, 452 US 692 (1981). Rather, the custody inquiry "turn[s] on whether a formal arrest occurred or whether there was a restraint on freedom of movement of the degree associated with a formal arrest," a question that requires courts to "focus on the objective circumstances of the interrogation." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009) (quotation marks omitted); see also *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (the test for determining whether an individual is "in custody" for *Miranda* purposes is whether, under the totality of the circumstances, the "suspect's freedom of action is curtailed to a degree associated with formal arrest.").

A person is in custody if a reasonable person in the same situation would not feel free to terminate the interrogation. *Thompson v Keohane*, 516 US 99, 112 (1995). Indeed, "[t]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Stansbury*, 511 U.S. at 323. Several factors guide the inquiry: "the location of the interview; the length and manner of questioning; whether the individual possessed unrestrained freedom of movement during the interview; and whether the individual was told she need not answer the questions." *Panak*, 552 F.3d at 465. Courts also consider "whether the suspect initiated contact with the police . . . [or] acquiesced to their requests to answer some questions." *United States v. Swanson*, 341 F.3d 524, 529 (6th Cir. 2003) (quotation marks omitted). No one factor is dispositive (see *Panak*, 552 F.3d at 467), because the "in custody" question depends on the "totality of the circumstances," *Swanson*, 341 F.3d at 528.

7

Each of the factors referenced above weights in favor of a finding of custody. Mr. Armstrong was under FBI control from the moment agents broke his windows and breached his home. He did not "initiate[] contact with the police;" rather, he acquiesced to their authority. *Swanson*, 341 F.3d at 529. He was interrogated for nearly five hours in a small bathroom with an agent physically blocking his exit at all times. He was never "told []he need not answer the questions." *Panak*, 552 F.3d at 465. The questioning was confrontational: agents repeatedly accused him of lying, asked him to consider his place at the defense table in his future trial, and confronted him with incriminating evidence. Indeed, agents had been investigating Ms. Lecron and Mr. Armstrong for many months; they were not questioning a witness, they were interrogating a suspect. Further, the fact that incriminating evidence was conveyed to Mr. Armstrong throughout the interview weighs in favor of a finding of custody, because when an agent "'convey[s incriminating evidence], by word or deed, to the individual being questioned,'" during an interrogation, he has "used the information to create a hostile, coercive, freedom-inhibiting atmosphere." *Panak*, 552 F.3d at 469 (quoting *Stansbury*, 511 U.S. at 325). This is precisely what took place in Mr. Armstrong's bathroom.

The Government may contend that the interaction was not custodial because it took place in Mr. Armstrong's home. Indeed, "when police question a suspect in a residence," the encounter often will "not rise to the kind of custodial situation that necessitates *Miranda* warnings." *United States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998). However, even when an interrogation takes place in a suspect's home, it can still become custodial without a formal arrest. *See, e.g., Orozco v. Texas*, 394 U.S. 324, 325–26, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969). The Sixth Circuit has recognized that law enforcement action can convert an in-home interview into a custodial interrogation:

> The number of officers, the show of authority, the conspicuous display of drawn weapons, the nature of the questioning all may transform one's castle into an interrogation cell—turning an inherently comfortable and familiar environment into one that a reasonable

8

> person would perceive as unduly hostile, coercive and freedom-restraining.

*Panak*, 552 F.3d at 466 (citing *Craighead*, 539 F.3d at 1083). This makes sense because, as the Ninth Circuit noted in *Craighead*,

> If a reasonable person is interrogated inside his own home and is told he is "free to leave," where will he go? The library? The police station? He is already in the most constitutionally protected place on earth. To be "free" to leave is a hollow right if the one place the suspect cannot go is his own home. (citation omitted). Similarly, a reasonable person interrogated inside his own home may have a different understanding of whether he is truly free "to terminate the interrogation" if his home is crawling with law enforcement agents conducting a warrant-approved search. He may not feel that he can successfully terminate the interrogation if he knows that he cannot empty his home of his interrogators until they have completed their search.

*Craighead*, 539 F.3d at 1083.

In *Craighead*, the Ninth Circuit held that a defendant interrogated in his home under analogous facts was subjected to a custodial interrogation. There, eight armed law-enforcement officers served a search warrant at Ernest Craighead's home looking for evidence he possessed child pornography. *Craighead*, 539 F.3d at 1078. While other officers executed the warrant, and FBI agent and a local police detective asked to talk with Craighead about the warrant. Craighead was advised that he was not under arrest, and he was told that he was free to leave. *Id*. Craighead (who was not handcuffed) was led to a storage room at the back of the house to "have a private conversation." *Id*. Once in the room, the door was shut, and the detective stood with his back to the door. *Id*. Craighead was interrogated for 20-30 minutes. *Id*. The district court denied Craighead's motion to suppress, but the Ninth Circuit reversed, holding:

> Considering the totality of the circumstances as analyzed under the four factors listed above, we find that the fact that SA Andrews told Craighead that he was free to leave weighs in favor of finding he was not in custody, but the other three factors lead us to the conclusion that Craighead was in custody for purposes of Miranda. Craighead's home had become a police-dominated atmosphere. *Escorted to a storage*

9

> *room in his own home, sitting on a box, and observing an armed guard by the door, Craighead reasonably believed that there was simply nowhere for him to go.*

*Id.* at 1089 (emphasis added).

The facts here are even stronger than those in *Craighead*. Mr. Armstrong was handcuffed, while Mr. Craighead was not. Mr. Armstrong was taken to a small, cramped bathroom, while Mr. Craighead was taken to a storage room. Mr. Armstrong was interrogated for nearly five hours, while Mr. Craighead was interrogated for 20-30 minutes. However, the conclusion to be drawn is the same: "Escorted to a [bath]room in his own home, sitting on a [toilet], and observing an armed guard by the door, [Mr. Armstrong] reasonably believed that there was simply nowhere for him to go." *Id.*

Additionally, this Court has specifically addressed this very issue in a case where three FBI agents and seven local police officers executed a search warrant at a defendant's home. *See United States v. Cook*, 824 F. Supp.2d 776 (N.D. Ohio 2011) (Carr, J.). In *Cook*, the defendant (Cook) was asked to stand outside while the officers conducted a search. *Id.* at 778. Cook was not handcuffed or arrested, but was questioned by an agent while standing outside. *Id.* This Court held that the questioning at Cook's home was a custodial interrogation, based upon the show of force and the inexperience of the defendant:

> The agents' actions, though not involving physical restraint, as in *Flack*[4] and *Lopez*,[5] nonetheless constituted virtual confinement, whereby a reasonable person would not have felt free to leave. There is simply no likelihood that a nineteen-year-old defendant with no prior experience with the law would feel free to walk away from two F.B.I. agents shortly after they raided his home under the authority of a judicial warrant.
>
> I conclude, accordingly, that the defendant was, from the moment ten officers appeared at his door, in custody, as the law of custodial interrogation defines that term. I find that a reasonable person under the totality of these circumstances simply would not have felt free to

---

[4] *United States v. Flack*, Case No. 3:08-cr-108, 2009 WL 5031320 (E.D. Tenn. Dec. 11, 2009).

[5] *United States v. Lopez*, Case No. 02-20043, 2004 WL 250516 (E.D. Mich. Feb. 5, 2004).

>  leave the company of the agents until, done with their investigatory work, they drove him home.

*United States v. Cook*, 824 F. Supp.2d 776, 781 (N.D. Ohio 2011) (Carr, J.).

At the time of the interrogation here, Vincent Armstrong was a 22-year old with no meaningful experience with the law. There were approximately 20 (or more) agents in and around his home with weapons. All of his first-floor windows were broken. He was ordered, while staring down the barrels of several assault rifles (and a riot shield), to descend a staircase backwards with his hands over his head. He was handcuffed and led to a cramped, hot bathroom where he was interrogated for nearly five hours, all while an agent blocked his ability to leave. On the occasions where the interrogating agents left the room, another agent was brought in to guard him.

As in *Cook*, "[t]here is simply no likelihood" that Mr. Armstrong, a 22-year-old "defendant with no prior experience with the law would feel free to walk away from two F.B.I. agents shortly after they raided his home under the authority of a judicial warrant." *Id.* "Although officers may have told [him] he was not under arrest, their other actions and words communicated that he was expected to stay put while they executed the search warrant." *United States v. Sydnor*, Case No. 6:16-CR-21, 2016 WL 8672913, *8 (E.D.Ky. Dec. 9, 2016). Indeed, no reasonable person would have felt they were "at liberty to terminate the interrogation and leave" under these circumstances. *Keohane*, 516 U.S. at 112. As such, Mr. Armstrong was in custody at the time of his interview.

### 3. Mr. Armstrong was interrogated.

It cannot be reasonably disputed that Mr. Armstrong was interrogated. An interrogation is "express questioning or its functional equivalent" that law enforcement officers "should know [is] reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 300–02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). As noted above, the FBI had been investigating the defendants for

11

many months at the time of the search warrant, and Agents Coates and Pederson clearly intended to elicit incriminating answers from Mr. Armstrong. There can be no question, he was interrogated.

### 4. Mr. Armstrong's statements must be excluded.

As established above, the nearly five-hour interrogation of Mr. Armstrong was a custodial interrogation as defined by *Miranda* and its progeny. Mr. Armstrong was not given *Miranda* warnings either before or during his interrogation. The remedy for a *Miranda* violation is to exclude the tainted statement. *See Miranda*, 384 U.S. at 492. As such, the statement given by Mr. Armstrong must be excluded.

### CONCLUSION

Each and every statement made by Mr. Armstrong during his December 10, 2018 custodial interrogation was obtained in violation of his Fifth Amendment right against self-incrimination and his Fifth Amendment right to counsel. Accordingly, Mr. Armstrong respectfully asks this Court to suppress all custodial statements made by Mr. Armstrong on December 10, 2018 without appropriate *Miranda* warnings.

Respectfully submitted,

EASTMAN & SMITH LTD.

 /s/ Adam S. Nightingale
Adam S. Nightingale (0079095)
One SeaGate, 24th Floor
P.O. Box 10032
Toledo, Ohio  43699-0032
Telephone: (419) 241-6000
Fax: (419) 247-1777
E-Mail: asnightingale@eastmansmith.com

Attorney for Defendant Vincent Armstrong

## PROOF OF SERVICE

    This is to certify that a copy of the foregoing has been filed electronically this 3rd day of May 2019. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                            /s/ Adam S. Nightingale
                                            Attorney for Defendant Vincent Armstrong

4825541.1