1                   UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF OHIO
2                        WESTERN DIVISION

3    UNITED STATES OF AMERICA,        Case No. 3:19cr4
                                      Toledo, Ohio
4              Plaintiff,             August 8, 2019

5         vs.

6    VINCENT S. ARMSTRONG,
     aka VINCENT ARMSTRONG,
7
               Defendant.
8

9                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JAMES R. KNEPP, JR.
10                UNITED STATES MAGISTRATE JUDGE

11
                       CHANGE OF PLEA HEARING
12

13
     APPEARANCES:
14

15   For the Government:        Office of the U.S. Attorney
                                Northern District of Ohio
16                              By:  Michael J. Freeman, Esq.
                                3rd Floor
17                              4 Seagate
                                Toledo, Ohio  43604
18                              (419) 259-6376
                                michael.freeman2@usdoj.gov
19

20   For the Defendant:         Eastman & Smith
                                By:  Adam S. Nightingale, Esq.
21                              24th Floor
                                P.O. Box 10032
22                              One Seagate
                                Toledo, Ohio  43699-0032
23                              (419) 247-1728
                                asnightingale@eastmansmith.com
24

25

1

2

3      Court Reporter:              Lori Ann Callahan, RMR-CRR
                                    United States District Courthouse
4                                   Room 568
                                    2 South Main Street
5                                   Akron, Ohio  44308
                                    (330) 252-6022
6

7

8

9

10

11

12

13

14

15     Proceedings recorded by mechanical stenography from a
       digital audio recording; transcript produced by
16     computer-aided transcription.

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2                       - - -

3          THE CLERK:  United States District Court is now in

4     session.  The Honorable James R. Knepp presiding.

5          THE COURT:  Please be seated, everyone.

6          The next matter before the court is the United

7     States of America versus Vincent S. Armstrong.  It's Case

8     Number 3:19cr4.

9          Mr. Armstrong is present in the courtroom this

10    afternoon.  He's joined at counsel table by a distinguished

11    member of our CJA panel, Attorney Nightingale.  Here on

12    behalf of the government is AUSA Freeman.

13         It's my understanding the matter comes on this

14    afternoon for a change of plea or a re-arraignment, at which

15    time Mr. Armstrong is expected to withdraw his plea of not

16    guilty and enter a plea of guilty pursuant to a plea

17    agreement, an example of -- or at least a copy of which I

18    have seen.

19         Mr. Armstrong, there are several steps we have to

20    go through this afternoon.  It's not just as easy as me

21    saying, "How do you plead," and you say, "Guilty."  We have

22    to go through a couple of different -- a couple of different

23    things.

24         First of all, we have to talk about your agreement

25    to appear before me as opposed to one of the district

1    judges, and talk about the differences there.

2              We have to make sure you're competent.

3              We have to make sure that you understand your

4    trial rights.  I have to go through those in a little bit of

5    detail with you, make sure you understand the rights that

6    you're waiving.

7              I have to make sure that you fully understand the

8    nature of the charges, and I have to make sure that this is

9    being done voluntarily, that you've not been subjected to

10   some threats or promises beyond the scope of the plea

11   agreement.  So that's kind of how we're going to proceed.

12             The first thing we'll talk about is your agreement

13   to appear before me here this afternoon.  This goes all the

14   way back to the founding of the country.  At the time the

15   colonists wrote the Declaration of Independence, they were

16   pronouncing to King George that, in fact, the same King

17   employed the judges and the prosecutors, and they thought

18   that doesn't seem quite right.  So that was one of the --

19   one of the grievances that they aired in the Declaration of

20   Independence.

21             If we fast-forward to 1787, when the -- at the

22   constitutional convention, and they adopted the

23   Constitution, Article III of the Constitution provided for

24   an independent judiciary as a separate and coequal part of

25   government, and one of the foundations or cornerstones of

1    that Article III is the notion that we have life-tenured

2    judges in the federal system.

3         To this day, that's still the case.  We have, in

4    this very building, there are some life-tenured judges and

5    there are some judges that serve terms.  Life -- among the

6    life-tenured judges is Judge Carr, to whom your case is

7    ultimately assigned.  And he's appointed pursuant to Article

8    III of the Constitution for a life tenure.

9         I am, on the other hand, appointed pursuant to

10   Article I of the U.S. Constitution.  And the most notable

11   difference there is I serve eight years at a time and I have

12   to be reappointed every eight years.

13        I can do a lot of the same things that an Article

14   III judge does, but for some of the really critical things,

15   like listening to a man plead guilty for a felony charge, I

16   have to do that with the person's consent.

17        So I'm going to ask you some fairly

18   formalistic-sounding questions, but I just want to give you

19   a little bit of back -- the back story on why I am doing

20   that.

21        Do you understand that you have the right to

22   have -- I'm sorry.  You should never eat peanuts before you

23   come into court.  That's -- that just does not -- that does

24   not go well, because I've got one stuck in my mouth.

25        Do you understand that you have the right to have

1   these proceedings conducted by a United States district

2   judge, that is, by a judicial officer who serves a life

3   tenure?

4           Do you understand that?

5           THE DEFENDANT:  Yes.

6           THE COURT:  Do you understand I am not a district

7   judge?  They don't eat peanuts before they come into court.

8   I am what's called a United States magistrate judge.  I

9   serve an eight-year tenure.  I have to be reappointed every

10  eight years.

11          Do you understand that?

12          THE DEFENDANT:  Yes.

13          THE COURT:  Are you knowingly and voluntarily

14  agreeing to appear before me this afternoon for purposes of

15  conducting this proceeding even though I am not a district

16  judge?

17          THE DEFENDANT:  Yes.

18          THE COURT:  All right.  I have in front of me a

19  written consent, which appears to have your signature and

20  that of Mr. Nightingale.

21          Did you understand this form when you signed it?

22          THE DEFENDANT:  Correct.

23          THE COURT:  Okay.  I will find that you have

24  knowingly and voluntarily consented to appear before me this

25  afternoon, and we will proceed.

1        In a moment I am going to place you under oath.

2   Before I do that, I want to caution you about a couple of

3   things.  First of all, of course, if you say something

4   that's not true once you're placed under oath, you could be

5   prosecuted for perjury.  That's probably obvious.

6        Perhaps less obvious is part of pleading guilty is

7   going to involve me asking and presumably you telling me

8   that you did, in fact, do what the government says you did.

9   That would otherwise be a pretty spectacular violation of

10  your Fifth Amendment right to never have to testify against

11  yourself, but as part of pleading guilty in federal court,

12  at least in my courtroom, you're going to have to admit that

13  you did what the government says you did, and that, as I

14  said, would be violative of your Fifth Amendment right for

15  anyone to ask you that except in this particular

16  circumstance.  So that's -- that's coming.

17       I guess I always also right about now make sure

18  you understand that I am going to go through a lot of

19  different things today.  I am going to say, "Do you

20  understand you have this right?  Are you willing to waive

21  that right?"  And we'll do that multiple times.

22       I'm never going to ask you to waive your right to

23  counsel.  Your right to have an attorney with you in this

24  case stays with you as long as this case stays with you.  So

25  there is absolutely nothing that we are doing today that in

1    any way even puts a piece of paper in between you and

2    Mr. Nightingale.

3              Do you understand that?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Okay.  With that, I will ask you,

6    please, to stand and raise your right hand.  I am going to

7    place you under oath.

8         (Defendant sworn.)

9              THE COURT:  Please be seated.

10             Will you tell me your full name, please?

11             THE DEFENDANT:  Vincent Steven Armstrong.

12             THE COURT:  And how old are you, Mr. Armstrong?

13             THE DEFENDANT:  Twenty-three.

14             THE COURT:  And in what town did you reside before

15   you were taken into custody?

16             THE DEFENDANT:  Toledo, Ohio.

17             THE COURT:  Are you married, sir?

18             THE DEFENDANT:  No.

19             THE COURT:  Do you have any dependent children?

20             THE DEFENDANT:  No.

21             THE COURT:  How far did you go in school?

22             THE DEFENDANT:  Some college.

23             THE COURT:  So you're able to read and write with

24   no difficulty?

25             THE DEFENDANT:  Yes.

1          THE COURT:  Have you taken any medicine, any

2     alcohol or any drugs of abuse in the last day or so that

3     would in any way impair your ability to understand what's

4     going on here?

5          THE DEFENDANT:  No.

6          THE COURT:  Is your mind clear?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Do you understand you're sitting in

9     the courtroom -- in a courtroom in the courthouse in Toledo,

10    Ohio?

11         THE DEFENDANT:  Yes.

12         THE COURT:  What type of work have you done most

13    recently before you were taken into custody?

14         THE DEFENDANT:  Forklift operator.

15         THE COURT:  And how is your physical health?

16         THE DEFENDANT:  Good.

17         THE COURT:  Have you ever been under the care of a

18    doctor or a hospital or a clinic or a counselor or anything

19    like that for any kind of mental health situation?

20         THE DEFENDANT:  No.

21         THE COURT:  Mr. Nightingale, have you had any

22    difficulty communicating with Mr. Armstrong?

23         MR. NIGHTINGALE:  No, Your Honor.

24         THE COURT:  Do you believe he understands the

25    nature and purpose of our hearing here today?

1          MR. NIGHTINGALE:  I do.

2          THE COURT:  Do either you or Mr. Freeman have any

3     reservations about his mental competence here?

4          MR. NIGHTINGALE:  I do not.

5          MR. FREEMAN:  I do not, Your Honor.

6          THE COURT:  Neither do I.  I've had an opportunity

7     to interact, however briefly here with Mr. Armstrong.  I

8     have found his answers to be appropriate.  Therefore, I will

9     find that he is competent and we will proceed.

10          Mr. Armstrong, have you had enough time to speak

11     with Mr. Nightingale while this case has been proceeding?

12          THE DEFENDANT:  Yes, I have, Your Honor.

13          THE COURT:  Have you told him everything you know

14     about the case?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Have you discussed with him whether

17     you should take the case to trial or whether you should

18     enter into some sort of a plea?  Have you had those kind of

19     conversations?

20          THE DEFENDANT:  Yes, I have.

21          THE COURT:  Have you talked with him about what a

22     trial might look like and what your odds would be and those

23     kind of questions that I would think somebody contemplating

24     entering into a plea would want to have those kind of

25     conversations with his lawyer?

LORI A. CALLAHAN, RMR, CRR     (330) 252-6022

1          Have you had those?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  Kind of a big-picture question here,

4   sir:  Are you satisfied with the legal representation which

5   you've had in this case?

6          THE DEFENDANT:  Yes, I am.

7          THE COURT:  Mr. Nightingale, have you had enough

8   time to prepare Mr. Armstrong at each and every stage of

9   this proceeding?

10         MR. NIGHTINGALE:  I have.

11         THE COURT:  And remember, Mr. Armstrong, if you

12  need to stop and talk with him at any point during the

13  proceeding, just let me know and we'll stop and you can ask

14  him a question.  That's fine.  Okay?

15         THE DEFENDANT:  Awesome.

16         THE COURT:  I know that it's spelled out a little

17  bit in the plea agreement, but I -- as part of -- the part

18  of this proceeding that's called an arraignment or

19  re-arraignment involves me ascertaining pretty specifically

20  that you understand the nature of the charges and of the

21  potential penalties.  So at this point, I am going to ask

22  Mr. Freeman to describe for us the charge or charges to

23  which we anticipate that Mr. Armstrong is going to change

24  his plea, and as you do that, talk about what the potential

25  punishment could be for a conviction as to those charges, or

1    that charge.

2              MR. FREEMAN:  Certainly, Your Honor.

3              Pursuant to the plea agreement that we will get to

4    in a moment, the defendant is agreeing to plead guilty to

5    Count 1 of the indictment, which is conspiracy to transport

6    or receive an explosive with the intent to kill, injure or

7    intimidate any individual, and maliciously damage or destroy

8    property by fire or explosive.

9              The statutory elements of that particular offense

10   is, one, the defendant did conspire, combine, confederate

11   and agree with another person; and two, the agreement was to

12   transport or receive in interstate or foreign commerce an

13   explosive, with the knowledge and intent that it will be

14   used to kill, injure or intimidate any person; and the

15   agreement was to maliciously damage or destroy by means of

16   fire or explosive materials a building, vehicle or other

17   real or personal property used in interstate or foreign

18   commerce or in any activity affecting interstate or foreign

19   commerce.

20             The statutory penalties associated with that

21   violation, there is a statutory mandatory minimum of 5

22   years, or 60 months, of imprisonment, with a statutory

23   maximum of 20 years.  There is a maximum statutory fine of

24   $250,000, a maximum period of 3 years of supervised release.

25   And seeing that it is a federal felony, there is a mandatory

1       $100 special assessment.

2               If the defendant were to be placed on a period of

3       supervised release and violate a term or condition of that

4       supervised release, he could be subjected to an additional

5       penalty, including additional incarceration.  With that in

6       conjunction with the original sentence could actually exceed

7       the statutory maximum.

8               THE COURT:  Thank you, Mr. Freeman.

9               Is that consistent with your understanding of the

10      charge to which you're contemplating changing your plea,

11      Mr. Armstrong?

12              THE DEFENDANT:  Yes, Your Honor.

13              THE COURT:  So you can tell me that you do

14      understand the nature of that charge?

15              THE DEFENDANT:  Yes.

16              THE COURT:  And you understand that if you enter a

17      plea of guilty with regard to that charge, you're going to

18      be waiving any right to claim innocence as to that count?

19              THE DEFENDANT:  Correct.

20              THE COURT:  So knowing Mr. Nightingale as I do,

21      I'm confident that he's talked with you about your trial

22      rights, but as I read Rule 11, it says that I have to have a

23      chat with you.  It actually doesn't use the word "chat," it

24      says "colloquy," but I say "chat."  It says I have to talk

25      to you about your trial rights, which will be waived if you

1    enter a plea today.

2            Under the laws of the United States, you have a

3    right to have a trial.  That trial could be to a judge, but

4    will almost certainly be to a jury.  At that trial, you have

5    the right to confront and cross-examine any witnesses that

6    the government might bring in to testify against you.  You'd

7    have the right to compel the attendance of any witnesses you

8    wish to have come in and testify on your behalf at the

9    trial.

10           Do you understand all that?

11           THE DEFENDANT:  Yes.

12           THE COURT:  Okay.  At the trial, you'd have the

13   right to testify yourself if you wanted to.  You'd also have

14   the right to not testify.  And if you chose not to testify,

15   nobody could hold that against you.  The government couldn't

16   comment about it.  The jury would be instructed that it

17   would be a violation of their oath if they held it against

18   you if you chose not to testify.

19           At the trial, the government always has the burden

20   of proof.  You begin the trial not guilty.  You have a

21   presumption of innocence, they call it.  But what that just

22   means is, at the beginning -- at the beginning of the trial,

23   you are not guilty, and you stay not guilty unless and until

24   the government proves your guilt beyond a reasonable doubt.

25           And that's a really -- that's a hard burden.  It's

1        typical for the jury to hear an instruction along the lines

2        of the kind of evidence that they would need to make the

3        most important decision in their life.

4                    Do you understand all of that?

5                    THE DEFENDANT:  Yes.

6                    THE COURT:  So if the case went to trial, we'd

7        bring in a bunch of prospective jurors from around this

8        division of the district, which is 21 counties, we'd bring

9        them here to the courthouse and we'd have a process called

10       voir dire.

11                   And what that is, is it's just sort of asking

12       questions to the jurors to make sure or to ascertain that a

13       particular juror can be fair and impartial.  In other words,

14       can they adjudicate the case based on the evidence that they

15       see and hear in the courtroom and follow the instructions of

16       law that the judge gives them and not be unduly influenced

17       by other things and other thoughts, that kind of thing.

18                   So once we had a jury that -- or a panel, anyway,

19       that the judge was convinced could be fair and impartial,

20       then each side would have an opportunity to dismiss some

21       jurors for what are called peremptory challenges.  And those

22       are -- those are challenges that you get to dismiss them and

23       you don't have to say why.  You can send home a juror just

24       because you don't want that juror to be on your case.  The

25       defendant typically gets ten of those and the government

1    gets six of those.

2            Once we had a jury selected, they would be

3    comprised of 12 individuals, and they would have to agree

4    unanimously -- they'd have to consider each count separately

5    and they'd have to -- and each defendant separately.  So

6    they'd have to consider each count and each defendant

7    separately, and they'd have to agree unanimously before they

8    could return a verdict.

9            Do you understand all of that?

10           THE DEFENDANT:  Yes.

11           THE COURT:  All right.  Do you understand that by

12   entering the plea of guilty today, you're giving up all

13   those rights to trial I just talked about?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Do you understand you have a right to

16   maintain your plea of not guilty here?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  Do you understand if -- let me say it

19   this way:

20           Do you understand you don't have to plead guilty

21   even if you are guilty?  You don't have to plead guilty even

22   if you're guilty.

23           Do you understand that?

24           THE DEFENDANT:  Yes.

25           THE COURT:  You could maintain your plea of not

1    guilty and then you'd have a right to have a trial.  You'd

2    have a right to have counsel at the trial.  And if you

3    couldn't afford counsel, the court would continue to provide

4    counsel for you.

5            Do you understand all of that?

6            THE DEFENDANT:  Yes.

7            THE COURT:  So if the case went to trial and if

8    you were convicted, you'd have a right to appeal your

9    conviction, and you'd also have a right to appeal your

10   sentence under certain circumstances.

11           I call to your attention the plea agreement

12   contains a waiver of your appellate rights.  And it's really

13   broad.  Frankly, it's as broad as it can be and still be

14   enforceable.  So, in other words, you're waiving every

15   appellate right that you can legally waive.

16           You're preserving certain appellate rights;

17   namely, prosecutorial misconduct, ineffective assistance of

18   counsel and a sentence outside of -- outside of the statute

19   or the guidelines.  But as a practical matter -- above that

20   guideline maximum anyway.  As a practical matter, it's a

21   pretty broad waiver of your right to appeal.

22           Do you understand that?

23           THE DEFENDANT:  Yes.

24           THE COURT:  And I further caution you that our

25   Court of Appeals, which is the Sixth Circuit down in

1    Cincinnati, tends to enforce those terms.  So you would --

2    such a waiver.  You would be -- it would be imprudent for

3    you to sit here today and waive your right to appeal and

4    think that you could just take an appeal anyway, because our

5    Court of Appeals tends to enforce those.

6              Do you understand everything I've told you so far?

7              THE DEFENDANT:  Yes.

8              THE COURT:  All right.  So if you -- if you plead

9    guilty when I ask you how do you plead today, you're going

10   to be waiving all these rights we've talked about, and

11   what's going to happen is I'm going to make a recommendation

12   to Judge Carr.  He's going to review the transcript.

13   Assuming he concurs with my findings, he's going to enter a

14   judgment of guilty, and then ultimately you're going to be

15   sentenced in this case based on that guilty adjudication as

16   well as the presentence investigation report, which will be

17   prepared between now and then.  So that's what's going to

18   happen.

19             So I don't know to what extent you are presently

20   possessed of these rights, but let me caution you that

21   pleading guilty will have an effect in some instances

22   permanently, in some instances temporarily, upon some

23   important rights that most citizens have.

24             So you should expect your guilty plea to,

25   certainly for some period of time, at least, interfere or

1    deprive you of your right to hold public office, your right

2    to vote, your right to sit on a jury.  And I can state in no

3    uncertain terms, I think Mr. Freeman may have stated, but

4    I'll say it this way -- maybe not.

5            If you were -- if you're convicted of a felony in

6    federal court, you will never again for the rest of your

7    life ever legally possess a firearm or ammunition.

8            Do you understand that?

9            THE DEFENDANT:  Yes.

10           THE COURT:  Okay.  I'm going to turn now to the

11   plea agreement to which I had an opportunity to review

12   earlier today.  And I trust you've had an opportunity to

13   review it, Mr. Armstrong?

14           THE DEFENDANT:  Yes, I have.

15           THE COURT:  And you've gone through it and you've

16   talked about it with Mr. Nightingale?

17           THE DEFENDANT:  Yes.

18           THE COURT:  Okay.  I'm going to go through it, or

19   ask Mr. Freeman to go through it one last time here in open

20   court.  He's not going to read it, but he's going to talk

21   about some of the pertinent provisions in this plea

22   agreement.

23           I want you to listen carefully.  I want you to

24   follow along.  And I want everything that you hear him say

25   to be completely consistent with your understanding of

1    what's contained in this plea agreement.

2           If you hear something that isn't completely

3    consistent with what you think is in there, we need to stop

4    and you need to talk to Mr. Nightingale and we need to

5    figure out what's wrong.  Okay?  Because at the end, what's

6    written on these pages is what's going to ultimately

7    control.  But this is just one last chance to make sure that

8    you completely understand everything on these pages.  Okay?

9           THE DEFENDANT:  Yes.

10          THE COURT:  All right.  Mr. Freeman.

11          MR. FREEMAN:  Thank you, Your Honor.

12          The written plea agreement as referenced by the

13   court is a 12-page document, including the signature page.

14          I'll begin on page 1.  That this is pursuant to

15   Rule 11(c)(1)(A) and (B), meaning there are recommendations

16   by both parties, but this agreement is not binding upon the

17   court.

18          Paragraph 1 sets forth the waiver of

19   constitutional trial rights.  I'm not going to go through

20   them again.  They just set forth the same trial rights that

21   the court went over with Mr. Armstrong.  And he understands

22   that he's giving up all of those rights, with the exception

23   of his right to counsel.

24          Paragraph 2 sets forth the statutory penalties as

25   I had went over at the beginning of this hearing.  That

1    there is a mandatory minimum 5 years and a maximum of 20

2    years.  Additionally, there is the supervised release.  And

3    if he were to violate, he would be subjected to additional

4    penalties.

5          Paragraph 7 sets forth that he agrees to plead

6    guilty to Count 1 of the indictment in this case.  In

7    exchange, at the time of sentencing, the government will

8    move to dismiss Counts 2, 3 and 6 of the indictment.

9    Additionally, the United States Attorney's Office will not

10   bring any other criminal charges against the defendant for

11   violations known to the United States Attorney's Office on

12   the date of this execution, that being today.

13         Paragraph 9 sets forth the statutory elements of

14   the crime in which he is pleading guilty to, that being 844,

15   subsection (n), as I had previously gone over at the

16   beginning of this hearing.

17         Paragraph 10 sets forth that there are sentencing

18   guidelines.  And the defendant understands that the

19   discretion lies with the court ultimately to sentence him to

20   a sufficient, but not greater than necessary, in order to

21   comport with the statute of 3553(a).  But in that, he

22   understands that they will consider -- the court will

23   consider the United States Sentencing Guidelines.

24         Paragraph 11 states that he understands that the

25   advisory guideline range will be determined by the court at

1    the time of sentence and after the United States Probation

2    Office has been able to gather information and make a report

3    for the court's review.  And he understands the United

4    States Attorney's Office will provide all relevant

5    information to prepare that document for the court.

6                As I indicated, this is not a binding plea

7    agreement.  However, in paragraph 12, there are joint

8    recommendations to use the advisory sentencing guidelines,

9    that both parties, the defense and the prosecution agree to

10   recommend a sentence within the guideline range as

11   articulated later on in this particular plea agreement, and

12   that neither party will suggest or ask specifically for a

13   departure or variance from that guideline range.

14               As I indicated, paragraph 13, even though there is

15   a joint recommendation, it is not binding upon the court,

16   the court may sentence the defendant to whatever he deems

17   appropriate, considering the factors listed in 3553(a).  I

18   would note there is a mandatory minimum of five years, which

19   the court would be bound to.

20               Paragraph 4 [sic] states allocution, which is a

21   fancy legal term that both parties will have an opportunity

22   to speak at sentencing.

23               THE COURT:  That's -- you said 4.  It's 14.

24               MR. FREEMAN:  If I said 4, I meant 14, Your Honor.

25   I apologize.

1          THE COURT:  That's all right.

2          MR. FREEMAN:  Beginning in paragraph 15 sets forth

3   the stipulated guideline computation.  I would note that the

4   index of the guidelines would relay you to Section 2K1.4.

5   However, both parties agree that the cross-reference in that

6   particular statute applies, that making 2A1.5 the

7   appropriate guideline, with a base offense level of 33.

8   That's with any -- without any reduction for acceptance of

9   responsibility.

10          However, paragraph 16 states the United States

11  Attorney's Office has no reason to believe at this time he

12  has not clearly and affirmatively accepted responsibility,

13  and agrees to make a three-level reduction pursuant to

14  3E1.1(a) and (b), as long as he continues to reflect his

15  acceptance of responsibility.  However, the defendant

16  understands, like other things in this particular case, it

17  is ultimately up to the court whether he has satisfied the

18  elements required.

19          Paragraph 17 is there's a criminal history

20  category, and that the parties have no agreement to that.

21  Just in preliminary discussion, it is both the prosecution

22  and defense anticipation that he is a Criminal History

23  Category I.  However, there is no binding agreement to that

24  particular category.

25          Paragraph 18 and 19 was discussed by the court,

1   which is the waiver of appeal rights.  Specifically, he's

2   waiving or giving up those rights, with the limited

3   exceptions of punishment in excess of the statutory maximum,

4   in this particular case 20 years, or any sentence to the

5   extent it exceeds the maximum of the range as determined by

6   this particular agreement, using the criminal history

7   category found by the court.  Additionally, he gives up any

8   defense based off of the statute of limitations, and he does

9   preserve the right based off of prosecutorial misconduct or

10  ineffective assistance of counsel.

11          I am going to skip over paragraph 20 for the time

12  being, which sets forth a factual basis, and go to the page

13  9, under the title "Other Provisions," sometimes referred to

14  as the miscellaneous provisions of the plea agreement.

15          Paragraph 22 is the defendant agrees to submit a

16  financial statement if requested.

17          Paragraph 23 is the parties are free to advise the

18  court about matters not expressly addressed.  That if this

19  agreement is silent on any aspect, that each party is free

20  to advocate as they deem appropriate.

21          Paragraph 24 is consequences of breaching the plea

22  agreement.  The defendant understands that if he breaches

23  any promises in this agreement, commits additional crimes,

24  obstructs justice, attempts to withdraw defendant's guilty

25  plea, or if the guilty plea is rejected, vacated or set

1    aside, the United States Attorney's Office will be released

2    from all of its obligations, and it may institute or

3    maintain any charge and make any recommendation with respect

4    to sentence which would otherwise be prohibited under this

5    agreement.

6             Paragraph 25 is this agreement is not binding on

7    other jurisdictions.  Meaning this agreement only binds the

8    United States Attorney's Office for the Northern District of

9    Ohio.  It does not bind any other federal, state or local

10   government.

11            Paragraph 26 was discussed briefly with the

12   defendant, but he is satisfied with his assistance of

13   counsel, and feels that he has had an appropriate amount of

14   time to discuss this matter with him.

15            Paragraph 27 states that the agreement is complete

16   and voluntary, that there has been no threats or promises

17   made to the defendant other than those contained within this

18   agreement to enter into a guilty plea, and he is making that

19   ultimate decision voluntarily.

20            THE COURT:  Thank you, Mr. Freeman.

21            Mr. Nightingale, was that an accurate

22   excerpt/summary of the plea agreement, to your

23   understanding?

24            MR. NIGHTINGALE:  Yes, Your Honor.

25            THE COURT:  And, Mr. Armstrong, was everything you

LORI A. CALLAHAN, RMR, CRR       (330) 252-6022

1     just heard from Mr. Freeman consistent with your

2     understanding of what's in that plea agreement?

3                 THE DEFENDANT:  Yes, Your Honor.

4                 THE COURT:  Okay.  So I'll just hit on a couple of

5     things that are so important, we need to go over them yet

6     again, because I understand it's been a number of times.

7                 The critical one is, I don't know what Judge Carr

8     is going to sentence you to.  You don't know what Judge Carr

9     is going to sentence you to.  But what I can tell you is, if

10    he happens to sentence you more severely than you expect,

11    that might be a basis under certain limited circumstances,

12    we kind of talked that, might be a basis to take an appeal.

13    But the one thing I can guarantee you is, it won't be a

14    basis to come back and revisit your guilty plea here today.

15                Do you understand that?

16                THE DEFENDANT:  Yes.

17                THE COURT:  Okay.  And again, the sentence in this

18    case is ultimately going to be reflected -- at least a

19    recommended sentence in the presentence investigative

20    report, and that will drive the sentencing guideline

21    calculations.  But you just need to understand, those are

22    not binding on the court.  Those are advisory in nature.

23                Do you understand that?

24                THE DEFENDANT:  Yes, I do.

25                THE COURT:  And I don't know what it's going to

1    say, you don't know what it's going to say, we have some

2    idea but we can't say for sure, but what we can say is it's

3    not binding, it's advisory.  There's a reference in here

4    you're going to be sentenced ultimately under 18, U.S.C.,

5    Section 3553(a).  And it basically lists a whole bunch of

6    considerations, everything from punishing you,

7    incapacitating you, rehabilitating you, and also serving as

8    warning to others and deterrence and those kind of things.

9              But in every instance, for every one of those

10    factors, it requires a sentence which is sufficient, but not

11    excessive.  Those are the magic words.  And I think

12    Mr. Freeman even used those same words.

13              Do you understand that?

14              THE DEFENDANT:  Yes, I do, Your Honor.

15              THE COURT:  All right.  So in a couple of minutes,

16    I'm going to ask Mr. Freeman about the factual basis for the

17    plea.  And what that is, I told you at the beginning I

18    wasn't going to let you plead guilty unless you told me you

19    did what the government says you did.  That's set forth in

20    the plea agreement called the factual basis.  So it makes it

21    a little easier here, because presumably you and

22    Mr. Nightingale have already read and approved this.

23              But I'm going to -- I'm going to ask Mr. Freeman

24    to put in the record the factual basis for your plea.  And

25    what he's essentially doing now, and I know he'll be reading

1    it in large measure from the plea agreement, but he's

2    basically saying, "If the case went to trial, here's what

3    we'd prove."  And when he's done, I'm going to ask you if

4    he's right.

5              So please listen and follow along carefully.

6              Mr. Freeman.

7              MR. FREEMAN:  Thank you, Your Honor.

8              The factual basis, which I'm about to read

9    verbatim, is articulated in paragraph 20 on page 6 of the

10   plea agreement and then goes on to page 7, 8, and finishing

11   on page 9.

12             It states that "From in or around April of 2018 to

13   December 10th of 2018, in the Northern District of Ohio,

14   Western Division, and elsewhere, Defendants Elizabeth Lecron

15   and Vincent Armstrong did combine, conspire, confederate,

16   and agree to (a) transport and receive in interstate or

17   foreign commerce, an explosive with the knowledge and intent

18   that it would be used to kill, injure, and intimidate an

19   individual; and (b) maliciously damage and destroy by means

20   of fire and explosive materials a building, vehicle, or

21   other real or personal property to be used in interstate or

22   foreign commerce, or in an activity affecting interstate or

23   foreign commerce, in violation of Title 18, United States

24   Code, Section 844(d), (i) and (n).

25             "Defendant Vincent Armstrong met Elizabeth Lecron

1    in approximately February of 2018.  They started dating a

2    few months later and moved in together at a residence in

3    Toledo, Ohio.  Shortly after meeting, Lecron expressed her

4    interest in mass murderers to him and introduced Armstrong

5    to the 'True Crime Community,' commonly referred to as the

6    'TCC.'  The TCC was a group that operated across numerous

7    social media platforms that fixated and lionized mass

8    murderers with its members posting extremely graphic images,

9    videos, and sayings.  Lecron primarily used Tumblr to

10    participate in this group under the username

11    'ligaturemarkings,' and then later,

12    'charlestonchurchmiracle.'  Armstrong joined the Tumblr TCC

13    community using the profile name 'societysheretic.'

14            "Lecron routinely posted items about the Columbine

15    High School shooters and the Charleston Church shooter,

16    including calling them 'Godlike.'  Armstrong made TCC posts

17    including one with the words, 'I wanna -- I wanna contribute

18    to the chaos.'

19            "Lecron and Armstrong privately discussed

20    committing their own mass murder in the Toledo area.  They

21    referred to this attack as 'D-day.'  They discussed using

22    both guns and explosives during the attack to kill, injure,

23    and intimidate people.  They took several steps in

24    preparation for 'D-day.'  Armstrong owned an AK-47

25    semiautomatic rifle prior to the formulation of the plan;

1    however, Lecron purchased a Savage shotgun with Armstrong.

2    Both guns were to be used during the attack.  Additionally,

3    Lecron and Armstrong went to the shooting range to practice

4    their firearm skills.

5         "Lecron showed Armstrong a website that had

6    detailed instruction on how to make improvised bombs.

7    Armstrong visited the website and printed the instruction to

8    make a pipe bomb.  Lecron and Armstrong agreed to buy parts

9    for the pipe bomb.  Specifically, on June 3rd of 2018,

10   Armstrong purchased end caps and a drill from a local

11   hardware store.  Lecron expressed excitement when Armstrong

12   showed her the parts and they discussed the additional parts

13   still needed like the 'guts,' meaning the explosive

14   material.  They were to build the pipe bomb together.

15        "Lecron and Armstrong agreed on what they were

16   going to wear during the attack.  Armstrong purchased a

17   trench coat and a T-shirt that read, 'Society Failed Us.'

18   Lecron purchased combat boots that she felt would not slip

19   on all the blood during the attack and a T-shirt that read,

20   'False Prophet.'  Their attire was to emulate the Columbine

21   High School shooters.

22        "Armstrong and Lecron discussed several possible

23   targets of this attack to include attacks at a local mall,

24   during an annual costume party, and at a second floor bar in

25   downtown Toledo.  Ultimately, Lecron settled on the second

1    floor bar because they regularly frequented the bar, and

2    thus, their presence would not be suspicious, and because it

3    would be harder for victims to escape.  This bar was engaged

4    in activity that affected interstate commerce.

5         "Armstrong wrote about 'D-day' in his journal.

6    Specifically, in a journal entry dated June 8th of 2018,

7    Armstrong wrote, 'I have these thoughts ... these memories.

8    They haunt me.  I have a vision.  A vision to kill.  To hunt

9    the unwilling.  These peasants to society.  The hatred to

10   the human race is bewildering.  It feels so good to know I

11   will end it all.  Very soon.  I am buying a knife this

12   weekend to slay my prey.  To shake things up in the world.

13   I have also bought caps from the local hardware store for

14   bombs - pipe bombs to be exact.  Soon we will bring

15   destruction on society.  Fuck them!!  They are worthless

16   ungodlike scum who want to live by "their" rules and

17   constructs!'  Below the text there is a stick figure drawing

18   of a person shooting another person in the head.

19        "Lecron made similar journal entries in her own

20   diary about 'D-day.'  In a journal entry dated June the 5th

21   of 2018, Lecron wrote that visiting friends this weekend was

22   exhausting, but that 'D-day will be my salvation.'  In a

23   journal entry dated June 8th of 2018, she wrote, 'Vinny,'

24   referring to Mr. Armstrong, 'and I got into a fight last

25   night.  Not really a fight fight, but I caught him being

1    dishonest.  I'm really hurt.  Truly.  Why does this happen

2    to me???  I still love him immensely and D-day is on track.'

3    In a journal entry dated June 12th of 2018, Lecron wrote, 'I

4    have to practice with my Savage,' meaning her shotgun,

5    'more ... I am not good enough yet.  Practice makes

6    perfect.'  Below the entry is a drawing of a dead angel.

7            "In August of 2018, Armstrong and Lecron flew from

8    Detroit to Denver to visit the sights related to the

9    shooting at Columbine High School.  Lecron detailed this

10   trip on her Tumblr profile.  She posted photographs at

11   Columbine High School and the victim's memorial.  In these

12   posts, Lecron stated their next trip would be to Charleston

13   to visit 'the church,' a reference to the mass murder that

14   occurred there.

15           "Lecron and Armstrong devised their coverup story

16   if they were caught planning or committing their 'D-day'

17   attack.  Specifically, they agreed to tell others that their

18   plan to commit mass murder was merely 'role-playing.'

19           "On December 10th of 2018, law enforcement

20   executed search warrants at their house and vehicles.  In

21   the trunk of Armstrong's vehicle was a duffle bag containing

22   a tactical vest with two loaded magazines for an AK-47, two

23   loaded magazines for a pistol; a white T-shirt with black

24   lettering with 'Society Failed Us,' a black trench coat, gas

25   mask, a printout from a website with instructions on how to

1    construct various bombs and instructions to pick a lock.  In

2    the residence, law enforcement seized an AK-47, two shotguns

3    including the one purchased by Lecron, two handguns, and

4    ammunition for the guns.

5             "When questioned, Armstrong gave law enforcement

6    their coverup story and stated that all their planning was

7    'role-playing' or fantasy; but later admitted that they

8    genuinely planned on committing the attack for a significant

9    time frame."

10            This would all be in violation of Title 18, United

11   States Code, Section 844, subsection (d), (i) and (n).  And

12   he recognize that this is just a summary and not each and

13   every fact that could be proven.

14            THE COURT:  Thank you, Mr. Freeman.

15            Were you able to hear all that and follow along,

16   Mr. Armstrong?

17            THE DEFENDANT:  Yes.

18            THE COURT:  Was he right about all that?

19            THE DEFENDANT:  Yes, Your Honor.

20            THE COURT:  Do you disagree with any part of that?

21            THE DEFENDANT:  No, Your Honor.

22            THE COURT:  You don't want to make any corrections

23   to it?

24            THE DEFENDANT:  No, Your Honor.

25            THE COURT:  Mr. Nightingale, do you want to make

1    any additions or corrections to the factual basis for the

2    plea?

3              MR. NIGHTINGALE:  No, Your Honor.

4              THE COURT:  So in a minute here, Mr. Armstrong,

5    I'm going to ask you if you're ready to enter into this plea

6    agreement.  You'll note at the bottom right-hand corner of

7    every page, there is a spot for initials.  And what I want

8    is for you and I to have an agreement that if you place your

9    initials in that block, what you're telling me is, "Judge, I

10   understand every word on this page and I agree with it and

11   I'm going to be bound by it."

12             Can we have that understanding as between you and

13   me?

14             THE DEFENDANT:  Yes, Your Honor.

15             THE COURT:  Okay.  Are you prepared to put your

16   initials in those blocks?

17             THE DEFENDANT:  Yes, I am, Your Honor.

18             THE COURT:  Go ahead and do it then.

19             Okay.  Then similarly, Mr. Armstrong, on the last

20   page is a signature block for you and your lawyer and also

21   for Mr. Freeman.  And the same deal, I only want you to sign

22   it if you're willing to again tell me that "I understand

23   every word in this agreement and I under- -- I'm willing to

24   abide by it."

25             Are you willing to make that deal as well?

                LORI A. CALLAHAN, RMR, CRR      (330) 252-6022

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  Okay, then go ahead and sign it.

3          Mr. Armstrong, I've received the signed and

4    executed plea agreement.  I just want to ask you one last

5    time, have you satisfied yourself that you understand

6    every -- every term in this agreement?

7          THE DEFENDANT:  Yes, I am, Your Honor.

8          THE COURT:  Have you -- have you had all the

9    conversations that you need to have, either with your lawyer

10   or with any other individual or individuals that you would

11   need advice from before making such an important decision as

12   to enter into this agreement?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  Do you think it's in your best

15   interest to enter into this agreement?

16         THE DEFENDANT:  Yes, I do.

17         THE COURT:  And you're willing to abide by it?

18         THE DEFENDANT:  Yes, I am, Your Honor.

19         THE COURT:  All right.  I am going to cause the

20   plea agreement to be filed for ultimate consideration by the

21   district judge.

22         I guess here we go, Mr. Armstrong:

23         What is your plea to Count 1 of the indictment?

24         THE DEFENDANT:  Guilty.

25         THE COURT:  So you're telling me that you did, in

1    fact, conspire, combine, confederate and agree with another

2    individual to transport or receive in interstate or foreign

3    commerce an explosive with the knowledge and the intent that

4    it would be used to kill, injure, or intimidate some other

5    person, and that the agreement was to maliciously damage or

6    destroy by means of fire or explosive materials a building,

7    vehicle, or other real or personal property used with

8    interstate or foreign commerce?

9              Are you telling me that's what you did?

10             THE DEFENDANT:  Yes, Your Honor.

11             THE COURT:  Did anyone threaten you to cause you

12   to tell me that?

13             THE DEFENDANT:  No, Your Honor.

14             THE COURT:  Did anyone promise you anything other

15   than what's contained in your plea agreement?

16             THE DEFENDANT:  No, Your Honor.

17             THE COURT:  So you're telling me that you are

18   guilty because you are, in fact, guilty?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  Okay.  Since you acknowledge that you

21   are, in fact, guilty as charged in Count 1 of the

22   indictment, and I presume at the time of sentencing,

23   Mr. Freeman, it's the expectation that -- is he only

24   charged -- no, he's charged in other counts.  Those would be

25   dismissed at the time of sentencing; is that correct?

1          MR. FREEMAN:  Correct, Your Honor.

2          THE COURT:  Okay.  Since you acknowledge that you

3      are, in fact, guilty as charged in Count 1 of the

4      indictment, upon my finding that there's an adequate factual

5      basis for your plea, and also that you had the assistance of

6      an able attorney, that you know of your right to trial,

7      which is being waived assuming your plea is accepted, you

8      know what the maximum punishment is, as well as what the

9      advisory guidelines, at least preliminarily, provide, on the

10     basis of the answers which you gave here in court today

11     under oath in the presence of members of the public and

12     seated next to your lawyer, as well as in reliance upon the

13     remarks of counsel for both sides, I hereby make or renew

14     the following findings:

15          I find the defendant competent to make this plea.

16     I find he was advised of his constitutional rights.  I find

17     he made a knowing, intelligent and voluntary waiver of those

18     rights.  He was advised of his limited rights to appeal both

19     the conviction and the sentence.

20          I further find the plea was made knowingly,

21     voluntarily, with an understanding of the charge, the

22     maximum penalties involved, the effect of the plea, and upon

23     an adequate factual basis.

24          Accordingly, I will enter a finding this day, a

25     recommendation of guilty.  That will be taken up by the

1    district judge.  Assuming he concurs with my finding, a

2    judgment of guilty shall enter forthwith.

3              And ultimately you will be sentenced in this case

4    on -- I guess I don't have a specific date to give you.

5    I'll tell you it will be at least 16 or 17 weeks from today.

6    So you can figure on four months until the time of

7    sentencing.

8              To expedite the completion of the case, I'm going

9    to immediately refer it to the United States Pretrial and

10   Probation Office for the preparation of a presentence

11   investigation report.

12             The parties are instructed to review that

13   presentence investigative report early and often, and to

14   attempt to informally resolve any problems with it and to

15   lodge any formal objections to that report well in advance

16   of the sentencing hearing so that Judge Carr has an

17   opportunity to consider those before the immediate

18   chronological proximity to the sentencing hearing.

19             Mr. Armstrong, I admonish you, you are to

20   cooperate with the probation officer who's preparing that

21   presentence investigative report.

22             Now, you can have Mr. Nightingale there with you,

23   and you should, but at the same time, you need to cooperate

24   with the probation officer who's preparing that report.  If

25   you fail to do so, you can expect that that would be called

1    to the district judge's attention, it would be taken into

2    consideration by him in determining what the sentence in

3    this case should be and whether to grant credit for

4    acceptance of responsibility and whether to follow any joint

5    sentencing recommendation that the parties might otherwise

6    make.

7            Mr. Nightingale, as you know, Judge Carr requires

8    that you meet with Mr. Armstrong not less than one week

9    prior to the sentencing hearing to prepare him for that

10   hearing so that there aren't any surprises at that time.

11           Mr. Freeman, I think I've covered everything we

12   need to cover.  Is there anything else the government would

13   like to bring up before we adjourn today?

14           MR. FREEMAN:  No, Your Honor.  Thank you.

15           THE COURT:  Mr. Nightingale, on behalf of

16   Mr. Armstrong, anything come to mind that you would like us

17   to take up or you'd like me to cover either more thoroughly

18   or differently?

19           MR. NIGHTINGALE:  No, Your Honor.

20           THE COURT:  And I guess the most important

21   question of the day:

22           Mr. Armstrong, did you understand everything that

23   just happened here?

24           THE DEFENDANT:  Yes, I did, Your Honor.

25           THE COURT:  Any questions before we adjourn?

1          THE DEFENDANT:  No, Your Honor.

2          THE COURT:  All right, then, we will be adjourned.

3          THE CLERK:  All rise.

4      (Thereupon, the proceedings were concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript,

4    to the best of my ability, transcribed from a digital

5    audio recording from the record of proceedings in the

6    above-entitled matter.

7

8                    s/Lori A. Callahan
                     Lori Ann Callahan, RMR-CRR
9                    U.S. District Court, Suite 568
                     2 South Main Street
10                   Akron, Ohio  44308
                     (330) 252-6022
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25